UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                  :
UNITED STATES OF AMERICA          :
                                  :
        - v. -                    :        S1 10 Cr. 007 (CM)
                                  :
SANDY ANNABI and                  :
ZEHY JEREIS,                      :
                                  :
               Defendants.        :
                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x


**GOVERNMENT'S SENTENCING MEMORANDUM**


                              PREET BHARARA
                              United States Attorney for the
                              Southern District of New York
                              Attorney for the United States of America


JASON P.W. HALPERIN
PERRY A. CARBONE
Assistant United States Attorneys
        - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                :

UNITED STATES OF AMERICA        :

                               :

        - v. -               :            S1 10 Cr. 007 (CM)

                               :

SANDY ANNABI and            :
ZEHY JEREIS,                  :

                Defendants.    :

                               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S SENTENCING MEMORANDUM

### PRELIMINARY STATEMENT

       The Government respectfully submits this Memorandum in connection with the November 19, 2012 sentencings of defendants Sandy Annabi and Zehy Jereis.  Following a seven-week trial before this Court, the jury convicted Annabi and Jereis on all 11 counts. Together, the bipartisan deceitful duo of Yonkers politics now stand guilty of extorting cash payments from developers in exchange for Councilwoman Annabi's vote and of engaging in a long-term conspiracy to sell her vote.  Together, Annabi and Jereis changed the course of history in the fourth largest city in New York State – for all the wrong reasons.  Together, they have brought shame and incalculable embarrassment to the City of Yonkers.

       The trial revolved around two high-profile real estate development projects in Yonkers.  With the Longfellow Project, the defendants operated as nothing more than shakedown artists.  They told a developer who had spent millions of dollars and years of its time trying to do business in the City of Yonkers that the only way business would get done is if the developer made a cash payment of $20,000 to a City Councilwoman.  And with the Ridge Hill

Project, the largest development project in the City's history, Councilwoman Annabi suddenly and shockingly flipped her vote, allowing the project to proceed. She changed her vote not because she had successfully persuaded the developer to make the critical concessions she had fought for over two years, but because her political patron had secretly negotiated a $60,000 consulting contract with the developer for himself – a position he would treat as the ultimate no-show job.

The trial also shined a bright light on the parade of lies told by Annabi and Jereis. Lies to Councilwoman Annabi's colleagues on the City Council, lies to their friends who asked questions, and, most dishearteningly, lies to the people of Yonkers. Annabi and Jereis hid their secret dealings at every step. Annabi lied year after year on her Financial Disclosure forms, hiding the stream of money and benefits Jereis heaped upon her. They knew that had they disclosed the true nature of their relationship, people in Yonkers would start asking questions. They knew that had they disclosed *before Annabi flipped her vote on Ridge Hill* that Jereis had given Annabi hundreds of thousands of dollars and that he now stood to benefit if Ridge Hill was approved, that Annabi's colleagues on the City Council might very likely have called for her to be recused from the vote approving Ridge Hill. Annabi lied to her City Council colleagues when they asked if she had received anything from Jereis. And Jereis lied to his friends when they asked whether he had received a contract from the Ridge Hill developer.

The trial also demonstrated that Annabi's lies extended to numerous aspects of her life, such as the fact that she was really living outside her Council district. The jury also convicted Annabi of lying repeatedly to banks on three different mortgage loan applications – one of which included fake W-2 forms, fake pay stubs, and fake bank statements, all designed to deceive the banks into making Annabi appear to be more financially qualified than she actually

was (it is worth noting that one of those properties is now in foreclosure). Moreover, Annabi was also convicted of lying on her tax returns for two years. Her conduct in this regard included telling her tax preparer the preposterous story that she had loaned her father $50,000 in cash that he never repaid, and then trying to deduct the loss to reduce her tax liability. When the tax preparer asked Annabi for documentation, she tellingly told him, "This is not your business."

But the defendants' lies and concealment did not stop there. Once the Government began investigating their criminal conduct, the defendants did everything they could to stonewall, to lie, and to obstruct the investigation. When Councilwoman Annabi was asked by the FBI about the fake mortgage documents in her loan files, she claimed that her political enemies in Yonkers had somehow planted fake documents in bank files located across the country. This was a startling claim. And within weeks of realizing that they were under investigation, Annabi and Jereis took the following steps: (1) Annabi sent her brother to pick up all her documents from her tax preparer; (2) approximately 7,000 e-mails were deleted from Jereis's computer hard drive; and (3) Jereis lied to the Ridge Hill developer about the nature of the investigation.

Desperate to come up with an alternative rationale for why Jereis, a married man and the Republican Party Chairman, had given Annabi, a Democrat, nearly $200,000 over several years, Annabi and Jereis needed to invent a cover-up. And so they invented the so-called "love defense," that Jereis had given Annabi all these monies not because they were corrupt payments, but because he was in love with her. In an attempt to substantiate this defense, Annabi and Jereis offered fabricated e-mails designed to show that Jereis had always loved Annabi. In its Decision and Order denying all the defendants' post-trial motions, this Court said that these love e-mails were "of dubious provenance" and noted that the jury would be well

within its rights to draw the inference "that the emails were fakes." Decision at 7-8. More broadly, the Court dismissed the love defense, stating, "[n]either would it have been irrational for the jurors to conclude that Jereis's story of his seven years of unrequited courtship *was most likely a fiction as well*." Decision at 8 (emphasis added).

It was indeed a fiction. As the Court repeatedly reminded the jury during the trial: the defendants have every right to do nothing at trial since the Government bears the burden of proof. The defendants also have every right to mount a defense. But the defendants have no right to try to pull a fast one on the Court and the jury. But that is just what they did, in a blatant act of obstruction of justice.

In the end, the proof at trial unmasked Sandy Annabi and Zehy Jereis as brazen con artists. Unfortunately, in this con, the citizens of Yonkers were the mark.

And now, as they face this Court for sentencing for their very serious crimes in betraying the public trust, Annabi and Jereis once again peddle falsehoods. In her sentencing papers, Annabi holds herself out as naïve, an innocent dupe who did not know any better. She blames others for her plight time and time again, and does not accept one scintilla of responsibility for her own conduct. She submits a letter from a psychiatrist with a subsection describing Annabi's supposed "Naiveté." And yet, Annabi's conduct during the course of the conspiracy, and during the course of the cover-up, was anything but naïve. Rather, it was calculating, cunning, and deceitful. She placed her own interests above those of the citizens of Yonkers. She understood clearly the lies she was telling. Simply put, the proof at trial showed that Annabi is as naïve as a fox.

In his sentencing papers, Jereis – in a jaw-dropping display of gall – holds himself out as the ultimate family man who always acts unselfishly in thinking about other members of

his family first.  One wonders whether Jereis was thinking of his wife and the staggering public

humiliation he must have caused her by taking the witness stand at the highly publicized trial

before this Court to proclaim that he loved Sandy Annabi ever since, as the Court put it, the

"Sandy with the Blue Dress On" moment when she first ran for office in 2001.  Jereis's

attempted self-portrayal in his papers is the height of hypocrisy.

With that backdrop, this Memorandum addresses the factors to be considered by

the Court in imposing an appropriate sentence pursuant to Title 18, United States Code, Section

3553, and responds to certain sentencing arguments advanced by the defendants.  The Probation

Office has calculated Annabi's Sentencing Guidelines range at 135 to 168 months' imprisonment

and Jereis's range at 108 to 135 months' imprisonment.  The Probation Office deferred to the

Court and did not weigh in on whether the two-level enhancement for obstruction of justice

should apply.  The Government agrees with Probation's calculations, and submits that the

obstruction enhancement certainly applies for both defendants in this case.  Accordingly, the

Government respectfully submits that the Sentencing Guidelines range for Annabi is 168 to 210

months' imprisonment and that the range for Jereis is 135 to 168 months' imprisonment.  For the

reasons set forth in this Memorandum, the Government respectfully submits that sentences

within the Guidelines range are appropriate and warranted for both defendants.

## I.  SENTENCING GUIDELINES ANALYSIS[1]

Based on the evidence at trial and in this case, the Government submits that the

following Guidelines calculations apply to defendants Annabi and Jereis.

---

[1]      Because the Court discussed the proof at trial so thoroughly in its November 7, 2012 Decision and Order on
Defendants' Post-Trial Motions ("Decision"), *see* Decision at 2-29, the Government does not include a Factual
Background section in this submission but will proceed directly to the Sentencing Guidelines analysis.

A.     **Offense Conduct**

1.     **Base Offense Level**

For convictions under Title 18, United States Code, Sections 371, 666(a)(1)(B) and 666(a)(2), as in Count One, or convictions under Title 18, United States Code, Sections 1341, 1343, 1346, and 1349, as in Count Two, the applicable Guidelines sections are 2B1.1 and 2C1.1. Under Section 2C1.1, the base offense levels are as follows:

> **Annabi**      **14**, since she was a public official
>
> **Jereis**      **12**, since he was not a public official

2.     **Specific Offense Characteristics**

a.     **More than One Bribe Payment**

Pursuant to Section 2C1.1(b)(1), both defendants receive a **two-level enhancement** since the offense involved more than one bribe or extortion. *See, e.g.*, Annabi PSR ¶ 91. The conduct here consisted of hundreds of different payments from Jereis to Annabi over at least eight years.

b.     **The Loss Figure Is Legally Correct and Reasonable**

Pursuant to Section 2C1.1(b)(2), an enhancement is then added based on "the value of the payment, the benefit received or to be received in return for the payment, *the value of anything obtained or to be obtained by a public official or others acting with a public official*, or the loss to the government from the offense, whichever is greatest." U.S.S.G. § 2C1.1(b)(2) (emphasis added). The section directs that the table in Section 2B1.1 be used to calculate how many levels are added. In this case, the value of benefits obtained by the public official or others working with her amounts to the $194,501.99 received by Councilwoman Annabi over approximately eight years, plus the $60,000 consulting contract Jereis received from Forest City

6

Ratner ("FCR"), the Ridge Hill Project's developer, for delivering Annabi's vote to FCR (though Jereis ended up receiving only $15,000 from FCR since FCR stopped paying on the contract once it learned of the federal investigation into Jereis, the intended value of the contract obtained by Jereis was still the full $60,000). Thus, the total value obtained or to be obtained by Annabi and Jereis was $254,501.99, meaning that **12 levels** are added since the loss is more than $200,000. *See* U.S.S.G. § 2B1.1(b)(1)(G); Annabi PSR ¶ 92; Jereis PSR ¶ 90.

In their sentencing submissions, both defendants challenge the loss calculation in the PSRs as factually and legally incorrect and unreasonable as applied in this case. But the loss figure set forth in the PSR by the Probation Office in this case is accurate, appropriate, and quite conservative. As noted above, Section 2C1.1(b)(2) directs an increase in the offense level "[i]f the value of . . . the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official . . . exceeded $5,000 . . . ." U.S.S.G. § 2C1.1(b)(2). Specifically, Section 2C1.1(b)(2) provides a cross reference to the enhancement table in Section 2B1.1.

Courts have held that "in determining the amount of benefit to be received, courts may consider the expected benefits, not only the actual benefits received." *United States* v. *Griffin*, 324 F.3d 330, 366 (5th Cir. 2003) (citing cases). Appellate courts have repeatedly held that courts should use the expected benefit of the official act to the bribe-giver, and not the amount of the bribe received, in calculating the amount of loss under Section 2C1.1(b)(2). *See United States* v. *DeVegter*, 439 F.3d 1299, 1303-04 (11th Cir. 2006) (reversing district court that based enhancement on value of bribes instead of estimated profit to company receiving contract); *United States* v. *Muhammad*, 120 F.3d 688, 700 (7th Cir. 1997) (assessing loss from defendant-juror who sought bribe to sway jury verdict as the $933,000 damage award at stake in trial and

not the $2,500 bribe juror sought); *United States* v. *Ziglin*, 964 F.2d 756, 758 (8th Cir. 1992)

(holding that district court properly based loss on amount of tax liability defendant sought to

eliminate for third parties, not on defendant's personal kickbacks from role in bribery scheme);

*United States* v. *Kant*, 946 F.2d 267, 269 (4th Cir. 1991) (reversing district court that based

enhancement on value of bribes instead of estimated profit to company receiving contract).

   Here, the Probation Office opted for the conservative and lenient approach to

calculate the loss, using the value of the benefits received by Annabi and Jereis, as opposed to

the benefit to the developers.  The value of the benefits received by both the Longfellow

developer, Milio Management, and the Ridge Hill developer, Forest City Ratner, would be

exponentially higher than the amount of the bribes.  The Ridge Hill Project cost more than $600

million to build and the developer has indisputably made tens of millions of dollars from the

project.  And yet, the Probation Office did not use the amount of the developer's profit in its loss

calculations.  While much smaller in scope, the Longfellow project also promised to yield

significant financial benefits to the developer.  Indeed, setting aside the expected profit to the

Longfellow developer from turning School 6 and Longfellow into apartments, the Milios would

also receive very valuable real estate from the City of Yonkers.  Thus, the benefits to the

developers in this case dwarf the value of the payments received by Annabi and Jereis.

Accordingly, the Probation Office's calculations on this issue are fair, reasonable, appropriate,

and the most accurate way to determine the loss in this type of case.

    **c.**  **The Offense Involved a Public Official**

   Pursuant to Section 2C1.1(b)(3), because the offense involved an elected public

official, the offense level is increased by **4 levels**.

Thus, on the corruption counts, Annabi's offense level is **32** and Jereis's offense level is **30**.

### 3.    Grouping Analysis for Annabi

The jury convicted Annabi not only of the five corruption counts charged against her (Counts One, Two, Three, Five, and Six), but also of the five other counts with which she was charged, i.e., three counts of making false statements in loan applications, in violation of Title 18, United States Code, Section 1014 (Counts Seven, Eight, and Nine), and two counts of subscribing to false tax returns, in violation of Title 26, United States Code, Section 7206(1) (Counts Ten and Eleven).  Thus, for Annabi, a grouping analysis needs to be conducted.

#### a.    Group 1

As noted above, for the five corruption counts ("Group 1") of which Annabi was convicted, her offense level is **32**.

#### b.    Group 2

For the three counts charging false statements on loan applications ("Group 2") of which Annabi was convicted, the Guidelines are as follows:

For violations of Title 18, United States Code, Section 1014, Section 2B1.1 applies.  The base offense level is **7**.  *See* U.S.S.G. § 2B1.1(a)(1).

For the property at 13 Patton Drive in Yonkers (which related to Annabi's conviction on Count Seven), there was no loss.  For the property at 45 Bacon Place in Yonkers (which related to Annabi's conviction on Count Eight), the anticipated loss to the victim, PNC Bank, is $164,460.68.  *See* PSR ¶ 70.  For a loss of more than $120,000, **10 levels** are added.  *See* U.S.S.G. § 2B1.1(b)(1)(F).

Under Section 2B1.1(15)(A), if "the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense, increase by **2 levels.**" In this case, Annabi derived $1,060,800 in loans for the three properties from the financial institutions, as follows:

| | | |
|---|---|---|
| 13 Patton Drive | | |
| | $430,100 | *See* GX 463 |
| | $50,600 | *See* GX 464 |
| | | |
| 45 Bacon Place | | |
| | $440,000 | *See* GX 499 |
| | $82,500 | *See* GX 498 |
| | | |
| 245 Rumsey Road | | |
| | $57,600 | *See* GX 524 |
| | | |
| **$1,060,800** | | |

Accordingly, **2 levels** are added. But as Section 2B1.1(15)(D) explains, "If the resulting offense level determined under subdivision (A) or (B) is less than level **24**, increase to level **24**." Accordingly, since the resulting offense level under subdivision (A) is 19, the offense level is increased to 24. Thus, for Group 2, Annabi's offense level is **24**.

### c.   Group 3

Annabi was also convicted of two counts of subscribing to false and fraudulent U.S. Individual income tax returns, in violation of Title 26, United States Code, Section 7206(1). As per the records provided to Probation, the additional U.S. taxes Annabi owes because of her criminal conduct for 2005 and 2006 is $21,823. For New York State, the relevant conduct is $7,468. The total loss is thus $29,291. Under Sections 2T1.1(a)(1) and 2T4.1(D), the base offense level is thus **12**. Because the defendant failed to report or correctly identify the source of

income exceeding $10,000 in any year from criminal activity, **2 levels** are added. *See* §

2T1.1(b)(1).  Accordingly, Annabi's offense level for Group 3 is **14**.

**d.**     **Grouping Calculations**

Under the grouping analysis, Group 3, which is level 14, is disregarded since it is

9 or more levels less serious than Group 1, which has an offense level of 32. *See* § 3D1.4(c).  In

addition, Group 2, at level 24, is counted as one-half unit since it is 8 levels less than Group 1.

*See* § 3D1.4(b).  Thus, there are a total of 1 ½ units, which means an increase of **1 level**.

**4.**     **Obstruction – Annabi and Jereis**

Both Annabi and Jereis deserve a **2-level** obstruction enhancement for their

conduct during the investigation and prosecution of this case.  Section 3C1.1, entitled,

"Obstructing or Impeding the Administration of Justice," reads, in pertinent part:

> If (1) the defendant willfully obstructed or impeded, or attempted
> to obstruct or impede, the administration of justice with respect to
> the investigation, prosecution, or sentencing of the instant offense
> of conviction, and (2) the obstructive conduct related to (A) the
> defendant's offense of conviction and any relevant conduct . . .,
> increase the offense level by **2** levels.

U.S.S.G. § 3C1.1.

**a.**     **Annabi's Obstruction**

In this case, Annabi willfully obstructed or impeded, or attempted to obstruct or

impede the investigation numerous times.  Annabi was interviewed three times by Special

Agents from the Federal Bureau of Investigation ("FBI").  She lied and made misrepresentations

on each occasion.  At the start of the investigation, Annabi was interviewed twice, on January 30,

2007 and February 7, 2007.  In these two interviews, Annabi claimed, among other things, that

the false statements on her loan applications were mistakes.  She also said she did not know how

the fake W-2's, the fake pay stubs, and the fake bank statements – which all inflated her income

11

so she could qualify more easily for loans – had gotten into her loan files.  Annabi suggested that

her political enemies had somehow "planted" fake documents in her loan file to "set her up."

(*See* Trial Tr. 2313.)  In other words, Annabi claimed that her political enemies had worked in

tandem with loan processors at banks all across the country to place fake documents in her

mortgage loan files to embarrass her politically.  By finding Annabi guilty on all three loan

counts, the jury necessarily disbelieved Annabi's statements to this effect, thus warranting the **2-**

**level** enhancement.  Annabi also claimed she had no duty to report the financial benefits Jereis

gave her to pay for her apartment at 245 Rumsey Road in Yonkers as gifts to her because her

father (who had filed for bankruptcy in 2003) supposedly intended to repay Jereis the monies

Jereis had given Annabi.  (Tr. 2317-18.)

       Similarly, when she was interviewed by the undersigned Assistant United States

Attorneys and FBI agents with her counsel present on December 2, 2009, Annabi made

additional false statements designed to obstruct or impede the investigation and prosecution.

First, she said she had never taken any bribe payments, which the jury clearly did not believe.

Second, she said she never took any cash payments relating to the Longfellow Project, which

again, the jury did not believe since it convicted her on the counts related to the Longfellow

Project as well.  Third, when asked who had bought her the Rolex watch with the Mother of

Pearl diamond bezel dial for $3,847.31 in cash, Annabi first said she did not remember, but then

when pressed, she said that maybe Jereis had bought it for her.  (Tr. 2336.)  It defies credulity to

think that Annabi truly could not remember who had paid for such an expensive all-cash item for

her only a couple of years earlier.

       In the December 2, 2009 interview, Annabi acknowledged that Jereis had paid

$10,000 toward the purchase of a car for Annabi, but she said she did not view this as a benefit to

her. (Tr. 2330.)  Annabi also insisted that she had, in fact, made a $50,000 loan to her father that he then failed to repay, which justified her taking a $50,000 casualty loss on her 2005 tax returns. But as IRS Revenue Agent John Dennehy testified at trial, there is no evidence Annabi ever made any such loan.  Again, the jury almost certainly disbelieved Annabi on this point as well since it convicted her on Count 10, which charged her with false statements on her 2005 tax returns.  During this interview, Annabi vigorously denied that she had ever received cash from Jereis, a claim that the jury rejected when it returned guilty verdicts on the Longfellow counts.

Lastly, it was Annabi who tried to offer the phony love e-mails during the pretrial litigation phase of this case.  Annabi was the one who first presented the supposed e-mails to the Government as authentic.  Although it was Jereis who ultimately offered the e-mails at trial, Annabi, of course, knew that she had never received them from Jereis.  Thus, for all Annabi's myriad lies in her three different interviews with the FBI and for her sponsorship of the love e-mails that the Court determined were "of dubious provenance," Decision at 8, Annabi should certainly receive a **2-level** enhancement for obstruction of justice.

### b.      Jereis's Obstruction

Jereis testified in his own defense at trial.  His testimony was riddled with lies, contradictions, and false statements.  In addition, during his trial testimony, Jereis offered the love e-mails into evidence and held them out as authentic in a stark effort to deceive the jury. For these reasons, Jereis should also receive the **2-level** obstruction enhancement.

By the time Jereis testified in the defense case, numerous other witnesses had already provided substantial damaging testimony against Jereis during the Government's case-in-chief.  The following is a selection of examples of inconvenient or damaging testimony from non-cooperating witnesses that Jereis falsely denied during his cross-examination:

13

1.   Jereis denied saying to Mike Spano, "Where are the jobs for the
     Republican leadership?", meaning for himself, of course.  (Tr. 3252).

2.   Jereis also denied saying to Spano that Annabi was his "political creation."
     (Tr. 3241), though he did admit elsewhere in his testimony that he helped
     Annabi "define" herself politically.  (Tr. 2899).

3.   Jereis denied saying to FCR's Bruce Bender at their first meeting at the
     Marco Polo restaurant in Brooklyn, "maybe you're just hiring the wrong
     people."  (Tr. 3294).

4.   Jereis denied showing Joe Galimi Annabi's press release on his computer
     announcing her change in vote on the Ridge Hill Project in mid-June
     2006.  (Tr. 3228).

5.   Jereis disagreed with the FCR representatives who had testified that Jereis
     was very persistent about asking for a job with the company.  (Tr. 3231).
     This denial was particularly puzzling in light of the series of e-mails and
     phone calls Jereis sent FCR in June and July 2006 asking about his
     obtaining a consulting contract.  *See, e.g.*, GX 415, 416, 419, 421 (e-mails
     from Jereis to Cantone).

6.   Scott Cantone testified that Jereis told him he was "quarterbacking" the
     Longfellow Project for Annabi.  (Tr. 988-89).  But again, when asked
     about this, Jereis said, "I did not say that to Mr. Cantone."  (Tr. 3282-83).

7.   Jereis not only claimed that FCR asked him for the monthly reports only
     in March 2007 after the news reports appeared – despite the fact that it
     was written into his contract – but he then also claimed that he had never

14

filed most of his Chamber of Commerce reports until March 2007 because
Chamber President Kevin Cacace had also not asked him for monthly
reports.  (Tr. 3269).  Jereis testified to this story despite the fact that
Cacace had previously testified that during Jereis's one-year consulting
contract with the Chamber, Cacace had to constantly prod Jereis to give
Cacace the reports.

During his cross-examination, Jereis simply denied all this damaging testimony
from five or six different witnesses, none of whom had cooperation agreements.

Jereis also gave preposterous testimony about how despite having seen Annabi
numerous times before in the community "in church, weddings," (Tr. 2895), it was not until May
2001 *after Annabi had become a candidate for the City Council* when Jereis supposedly saw her
on the street in front of an apartment building and instantly fell in love:

> I saw Sandy there, and she was gorgeous.  She was beautiful.  She
> was wearing a summer blue dress, and I stopped the car, and I got
> out and I said, "What are you doing?"  And she goes, "Oh, running
> for office."  I said, "I'm going to meet your dad."  And at that point
> in time, I was very much – very attracted to her.  *It was like love at
> first sight.*

(Tr. 2896) (emphasis added).  The Court referred to this testimony as the "Sandy with the Blue
Dress On" moment.  *See* Decision at 5.  Jereis's testimony here was absurd on many levels,
especially because Jereis had just said only seconds before (literally, only one trial transcript
page previously) that he had seen Annabi numerous times before at church and at weddings.

By convicting Jereis on all counts, the jury determined that Jereis's so-called
"love" defense, i.e., that he gave Annabi nearly $200,000 in benefits only because he loved her,
and not because he had any intention of corruptly influencing her – was entirely not truthful.

Most glaringly of all, Jereis tried to convince the jury that the love e-mails were authentic. Concluding that the purported e-mails in which Jereis supposedly professed his love for Annabi were "of dubious provenance," the Court noted that "while the Government's expert, Det. Shlomo Koenig, could not say with certainty that the emails were fakes, he did testify that the digital drawer containing those emails had been tampered with in late February 2007 – while defendants were under investigation – and that there were no remnants of these emails on the hard drives of either Annabi's or Jereis' computers." Decision at 8 (citing Tr. 3381-89).[2] Not only did the Court express great skepticism about the authenticity of the e-mails, but more broadly, the Court noted that it would not "have been irrational for the jurors to conclude that Jereis' story of his seven years of unrequited courtship was *most likely a fiction as well.*" Decision at 8 (emphasis added).

In his sentencing submission, Jereis's counsel said he wanted to offer some observations because "they illuminate *Mr. Jereis' fundamental respect for the Court and for the process of which he has been a part.*" Jereis Sentencing Mem. ("Jereis Mem.") at 1 (emphasis added). But Jereis's false testimony and his offer of fake evidence designed to deceive the jury showed a *fundamental disrespect* for this Court and for the judicial process of which he has been a part.

In sum, because of Annabi's repeated lies to agents during the investigation, because of the defendants' acts of covering-up (most notably the creation of the fake e-mails and offering them at trial), and because of Jereis's perjury-filled trial testimony, both Annabi and Jereis deserve a **2-level** enhancement for obstruction of justice.

---

[2] As with Annabi, Jereis also participated in the cover-up of their crimes. Not only did he try to hold out the fake e-mails as authentic, but Detective Koenig also testified at trial that in late February 2007, only weeks after Jereis and Annabi learned of the federal investigation, approximately 7,000 e-mails were deleted from Jereis's hard drive. (Tr. 3381.)

5.     **Total Offense Level**

Thus, for Annabi, the total offense level is 32 (Group 1) + 1 (for the grouping) + 2 (obstruction) = **35**.  For Jereis, the total offense level is 30 + 2 (obstruction) = **32**.

B.     **Criminal History**

Annabi has no known criminal history, and thus is in **Criminal History Category ("CHC") I**.  Jereis has the following criminal convictions:

1.     On July 12, 1991, Jereis was convicted upon a plea of guilty in the
Greenburgh Town Court of unlawful dealing with fireworks, in violation of
New York Penal Law Section 270.00, which is a class B misdemeanor.  Jereis
was sentenced to a one-year conditional discharge, a fine of $200, and a $90
surcharge.  Because this conviction occurred more than 10 years prior to the
commission of the instant offense (which began in 2002), no criminal history
points are added.  *See* U.S.S.G. § 4A1.2(e)(3).

2.     On February 9, 1995, Jereis was convicted upon a plea of guilty in Yonkers
City Criminal Court of Criminal Facilitation in the 4th Degree, in violation of
New York Penal Law, Section 115, which is a class A misdemeanor.  Jereis
was sentenced to a one-year conditional discharge and a surcharge of $90.
Jereis receives **1** criminal history point for this offense.  *See* § 4A1.1(c).

3.     On April 30, 1998, Jereis was convicted upon a plea of guilty in Westchester
County Court to falsely attesting to voting petitions in violation of Section 17-
122(7) of the New York State Election Law, which is an unclassified
misdemeanor.  Jereis was sentenced to a one-year conditional discharge, a fine

17

of $250, and a $90 surcharge. Jereis receives **1** criminal history point for this offense. *See* U.S.S.G. § 4A1.1(c).

Jereis therefore has 2 criminal history points and is in **CHC II**.

In his sentencing submission, Jereis tries to argue that CHC II somehow overstates his criminal history. *See* Jereis Mem. at 3-4. In fact, though, there is an even more compelling argument that CHC II understates Jereis's criminal history (although the Government still submits that CHC II is the appropriate category). As the Probation Office said in explaining why it recommended a within-the-Guidelines-range sentence of 108 months' imprisonment for Jereis, "it should be noted that investigation into the instant offense revealed additional criminal conduct." Jereis PSR at 43. Probation cited two additional examples of uncharged criminal conduct. First, it noted that Jereis had made false statements on a notary application. During Jereis's cross-examination, the Government offered into evidence Jereis's notary application dated April 2, 2000. GX 2022. In his application, which Jereis signed "under the penalties of perjury," Jereis said he had never been convicted of a crime – though by the year 2000, he had already been convicted of three different crimes, in 1991, 1995, and 1998. During his cross-examination, Jereis acknowledged that he had made false statements on this notary application. (Trial Tr. 3197.)

Second, the Probation Office found that Jereis "was involved in a scheme to bribe a potential candidate for the New York State Senate so the candidate would not run for office." Jereis PSR at 43. Indeed, as the Court heard at trial, cooperating witness Anthony Mangone testified that at around the same exact time that Jereis was talking to Mangone about demanding a cash payment from the Milios in June 2006, Jereis was also involved in an unrelated bribe scheme. (Trial Tr. 1622-1623, 1763, and 1849.) Specifically, Jereis told Mangone that a

18

potential candidate for the Independence Party line for the State Senate would not challenge the incumbent State Senator Nicholas Spano (Jereis's and Mangone's boss) on that party line as long as the candidate received a $10,000 cash payment.  Trial Tr. 1622-23.  Mangone testified that during the summer of 2006, "Zehy had approached me and told me that in order to get the individual not to run, they were seeking a $10,000 payment."  Trial Tr. 1622.  Jereis made clear that the payment had to be in cash.  *Id.*  Around July 12, 2006, Jereis and Mangone went to the house of John Khader, who was a member of the Independence Party, and Mangone gave Khader $5,000 in cash in Jereis's presence.  Trial Tr. 1623.

In addition, in two different federal criminal trials in the Southern District of New York in 2005, cooperating witness Maurizio "Mo" Sanginiti testified that in the early part of the charged conspiracy in the instant case, i.e., in 2002 and 2003, Jereis took bribes from Sanginiti in exchange for agreeing to find out for Sanginiti whether there was a pending criminal investigation involving Sanginiti and his criminal associates (the subject arose as the Government in those trials was eliciting Sanginiti's disclosures pursuant to *Giglio* v. *United States*, 405 U.S. 150, 154 (1972)).[3]  Sanginiti testified that Jereis had represented to him that Jereis had influence with and sources of information within the Westchester County District Attorney's Office.  Sanginiti said he paid Jereis a weekly sum for a period of time in the 2002-2003 time frame so that Jereis would tip Sanginiti off if law enforcement learned of Sanginiti's bookmaking operation.  After Sanginiti was charged by the United States Attorney's Office for the Southern District of New York, he pled guilty to extortion, robbery, gambling, false statements, and firearms charges, and became a cooperating witness.

---

[3]      The first trial was captioned *United States* v. *DiPietro et al.*, 02 Cr. 1237 (SWK), at which the five defendants were convicted of extortion, loansharking, and firearms crimes.  The second trial was captioned *United States* v. *Rudaj*, 04 Cr. 1110 (DLC), at which the six defendants were convicted of racketeering, extortion, loansharking, gambling, and firearms crimes.

Accordingly, for all these reasons, CHC II can hardly be said to overstate the true length, depth, and scope of Jereis's actual criminal history. If anything, based on Jereis's conduct over the past 20 years, the opposite is true.

### C.    Appropriate Guidelines Range

Based on the calculations above, for Annabi, with total offense level 35 and CHC I, her Guidelines range is 168 to 210 months' imprisonment. For Jereis, with total offense level 32 and CHC II, his Guidelines range is 135 to 168 months' imprisonment.

## II.  THE SECTION 3553(a) FACTORS CALL FOR GUIDELINES SENTENCES

Sandy Annabi and Zehy Jereis face this Court for sentencing after being convicted of a battery of public corruption offenses. Annabi also stands convicted of three counts of lying to banks on mortgage applications and two counts of lying on her tax returns. As the Court examines the factors set forth in Title 18, United States Code, Section 3553(a) to determine the appropriate sentences for these two defendants, the Government respectfully submits that several Section 3553(a) factors counsel strongly in favor of sentences within the Guidelines range of 168 to 210 months' imprisonment for Annabi and 135 to 168 months' imprisonment for Jereis. Specifically, the nature and circumstances of the offense, the history and characteristics of the defendants, the need for the sentences imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, and to provide general deterrence, and the need to avoid unwarranted disparities among similarly situated defendants all militate toward the conclusion that Guidelines range sentences would be reasonable and appropriate in this case.

A.      **Applicable Law**

Although no longer mandatory, the Guidelines still provide strong guidance to the

Court. *See United States* v. *Booker*, 543 U.S. 220 (2005); *United States* v. *Crosby*, 397 F.3d 103

(2d Cir. 2005).  Indeed, as the Supreme Court explained, "a district court should begin all

sentencing proceedings by correctly calculating the applicable Guidelines range" – that "should

be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

The Guidelines' relevance throughout the sentencing process stems in part from the fact that,

while they are advisory, "the sentencing statutes envision both the sentencing judge and the

Commission as carrying out the same basic § 3553(a) objectives." *Rita* v. *United States*, 551

U.S. 338, 348 (2007); *see also Gall*, 552 U.S. at 46 (noting that the Guidelines are "the product

of careful study based on extensive empirical evidence derived from the review of thousands of

individual sentencing decisions").

After making the initial Guidelines calculation, a sentencing judge must then

consider the factors outlined in Title 18, United States Code, Section 3553(a), and "impose a

sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing

outlined in Section 3553(a)(2).  Those purposes are "(A) to reflect the seriousness of the offense,

to promote respect for the law, and to provide just punishment for the offense; (B) to afford

adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the

defendant; and (D) to provide the defendant with needed educational or vocational training,

medical care, or other correctional treatment in the most effective manner."  18 U.S.C. §

3553(a)(2).  In determining that sentence, this Court must consider "the nature and circumstances

of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), "the

kinds of sentences available," § 3553(a)(3), the Guidelines and Guideline range, § 3553(a)(4),

the Guidelines' policy statements, § 3553(a)(5), "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," § 3553(a)(6), and "the need to provide restitution to any victims of the offense," § 3553(a)(7).

**B.     Discussion**

In this case, sentences within the Guidelines range are supported by the Section 3553(a) factors for a number of reasons.

**1.     The Nature and Circumstances of the Offense**

Defendants Sandy Annabi and Zehy Jereis committed one of the most reprehensible crimes possible in a white collar context.  They did not just defraud banks (although Annabi did that too).  They did not just cheat on their taxes (although Annabi did that as well).  Rather, Annabi and Jereis defrauded an entire city.  They defrauded the entire City of Yonkers, a city with a rich, proud history dating back more than 350 years, to the times of the Dutch colonists.

In some ways, the story of this political corruption case is like many others – a high-level public official sold her office, placing her own financial desires above the interests of her constituents.  But in other ways, this case revolved around lies to the public in uniquely repugnant aspects.  Whether it was Councilwoman Annabi's incessant concealment on her financial disclosure forms, Annabi's lies to Council colleagues who asked questions about the true nature of her relationship with Jereis, Jereis's lies to friends who asked if he had received a contract from Forest City Ratner, or Annabi's lies on her loan applications and taxes to help hide the Big Lie – the fact that Jereis secretly gave her $200,000 to control her vote, the defendants' conduct in this case had one common thread.

22

Time and time again, their actions demonstrated a scorn for open and honest government. Their conduct showed their disdain for robust, free, and public debate on key issues facing the City of Yonkers. Indeed, the defendants' conduct demonstrated their scorn and disdain for the people of the City of Yonkers. Certainly, Councilwoman Annabi talked a good game, as she did in 2005 when she fulminated against Forest City Ratner for "robbing the city blind" and when she ridiculed the father-son developers, Antonio and Franco Milio, for trying to obtain a piece of property from the City for less than the cost of a bottle of soda.

But these spirited speeches by the Councilwoman were in 2005, before her political patron called in his favors on these projects, before Jereis called in those markers he had been laying down with her since she first decided to run for public office. And then things changed very quickly. After two years of staunch opposition to the Ridge Hill Project, the largest development project in the City's history, it took only 13 days for Annabi to flip her vote, once Jereis met with the developers and secured for himself a lucrative job with Forest City Ratner. On Longfellow, all it took for Annabi to flip her vote and to decide that virtually the same exact project was apparently no longer "a slap in the face to the taxpayers of Yonkers" was cold, hard cash – and lots of it. Enough cash for Annabi to upgrade her flight to Jordan for her vacation to a business class ticket (bought in cash for more than $3,800) and to buy $7,000 in jewelry for herself, including paying more than $3,800 in cash for that special-ordered Rolex watch with the Mother of Pearl diamond bezel dial.

And in contrast to the innocent naïf that Annabi now tries to hold herself out as to this Court as she faces sentencing, Annabi's calculated behavior revealed itself at critical junctures in the case, as the jury saw at trial. Forest City Ratner's Scott Cantone testified about how when FCR met with Annabi and Jereis on June 14, 2006 – the day before Annabi would

stun many in Yonkers by suddenly and without notice issuing the press release announcing her

vote flip on Ridge Hill – the conversation focused on how to find a political parachute for

Annabi.  So too, with Longfellow, Mangone's July 10, 2006 e-mail to Franco Milio made it clear

that Annabi would now flip her vote on the Longfellow Project but she would insist on an

independent appraisal being done "for her own selfish political gain so that when people in her

district ask if she conducted one as she said she would, then she has cover."  GX 700.  Once

again, Annabi and Jereis concealed from the public and from Annabi's Council colleagues the

true nature of their dealings with the developer before the critical vote in July 2006.  As the

Court observed of the defendants' conduct in this case, "About the concealment there can be no

serious dispute."  Decision at 9.

At the trial in this matter, Annabi (through her counsel) attempted to remind the

jury at every opportunity that Councilwoman Annabi's Second Council District had the poorest

population in the City of Yonkers.  But rather than acting as a true champion for the poor,

Annabi displayed amazing hypocrisy by placing her own financial interests above those of her

disadvantaged constituents, by selling her votes, and cashing them in for a Mercedes Benz, a

Rolex watch, a diamond cross necklace, and upgraded plane tickets.

For his part, Jereis's conduct during the years-long conspiracy makes it clear that

even though he was the Republican political party chairman, he had no real political convictions

– other than doing what was best for his own financial interests.  Council members of both

parties testified at trial that the Republican Chairman was far more interested in the advancement

of the Democrat Annabi rather than advancing the interests of his own party members.

Through their conduct, Annabi and Jereis revealed an arrogant, selfish sense of

entitlement.  They acted as if the City Council position owed Sandy Annabi something, rather

than acting as if she owed her best, hardest, and most honest services to the people whom she had the honor to represent. It was this same sense of entitlement that led Annabi to show up in court one day shortly after she was indicted and to claim that she deserved to have the taxpayers pay her legal fees and then to drive away from court in her Mercedes. Jereis also showed his sense of entitlement by obtaining the $60,000 consulting contract from Forest City Ratner and then turning it into a no-show job (the same way he turned his $100,000 consulting contract with the Yonkers Chamber of Commerce into a no-show job).

Moreover, Annabi's lies extended to multiple phases of her life. As the Court observed about the proof at trial, "the record is full of evidence – overwhelming evidence – that Annabi herself made numerous false statements in connection with three separate loan applications." Decision at 26. Similarly, Annabi lied to her tax preparer in order to reap a financial windfall for herself. As the Court stated, "The evidence thus overwhelmingly supported the conclusion that Annabi gave false information to her tax preparer for the purpose of reducing her income tax liability." Decision at 28-29. And, of course, when she was caught she lied repeatedly to the federal agents interviewing her to further conceal her conduct. In short, the trial record demonstrated that Annabi was truth-challenged in a multitude of ways.

Accordingly, because of the long-term nature of this conspiracy, the many years of concealment and lies, and because of Annabi's and Jereis's self-serving deceit of the people of Yonkers for their own financial largesse, the nature and circumstances of the offense strongly call for sentences within the Guidelines range.

## 2.       The History and Characteristics of the Defendants

Sentences within the Guidelines range are also supported by "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

### a.   Annabi

### (1)   Annabi's History

Throughout Annabi's sentencing submission, she argues for leniency because her parents were convicted of narcotics trafficking when she was a teenager. *See* Annabi Mem. at 13-18. True as that may be, it does not provide Annabi with the excuse she seeks to avoid responsibility for her conduct.

Submitted in support of her request for a probationary sentence based on her upbringing is a psychiatric evaluation prepared by a Dr. John P. Docherty, who recently met with the defendant.[4] Dr. Docherty's letter offers no diagnosis or claim that Annabi suffers any mental disease or defect. Instead, he, in essence, offers his expert opinion that because of her upbringing, Annabi is not guilty of the crimes for which she stands convicted.

But the jury, which heard all the evidence in this case, came to a very different conclusion about Annabi's *mens rea*. And so while Annabi's parents' legal difficulties no doubt were very traumatic for the teenage Annabi, they do not justify or otherwise excuse her actions.

As the Christian theologian C.S. Lewis once famously remarked, "[a]n explanation of cause is not a justification by reason." That is so because many people come from disadvantaged backgrounds and the jails are full of people who come from dysfunctional, broken homes, raised by single parents, abusive parents, in poverty, and otherwise meager circumstances. Many of those individuals, however, are not criminals. Many individuals who experience adversity at a young age develop resiliency and become accomplished and productive members of society. Annabi was, in fact, one of those people. Despite having parents who were

---

[4]      Until the Government received the defendant Annabi's sentencing memorandum, the Government was unaware that the defendant had planned on submitting any expert testimony. The Government recently wrote to the defense and asked that Annabi be made available to a Government expert for a psychiatric evaluation. Annabi refused. For that reason alone, Dr. Docherty's letter should be disregarded.

convicted of serious crimes, she became an educated and successful professional who was

elected and re-elected to a city-wide office. Her accomplishments demonstrate that any

disadvantage she suffered as a result of her parents' incarceration was minimized by the very

large and supportive extended family she comes from. Moreover, her accomplishments in rising

to the City Council demonstrate that she was able to overcome these obstacles.

In her sentencing submission and in the accompanying letters from family

members, Annabi tells the Court that she was too sheltered and pampered, that she was wrapped

in a protective "cocoon," that her parents were "protective" of her, and that her parents'

overprotectiveness stifled her and "stripped [her] of the opportunity to interact with people

sufficient to develop the ability to judge others' character and motivations." Annabi Mem. at 13,

14, and 26. Annabi's claims are nonsense. First, all these alleged shortcomings did not prevent

Annabi from climbing the mountain of Yonkers politics to the City Council and with thoughts of

even higher office. Second, Annabi's background history of having overprotective parents pales

in comparison to some of the truly horrible, abusive life stories of the seriously disadvantaged

who have come before this Court. After all, as Annabi's mother herself acknowledges, "Sandy

grew up in an environment with much love, support and encouragement." Annabi Mem., Ex. E.

Thus, if anything, as a college graduate and a highly successful professional,

Annabi should have known better. This is particularly true since Annabi's brother and others tell

the Court that Annabi always wanted to "become a prosecutor to hold people accountable."

Annabi Mem., Ex. E.

And yet, Annabi never holds herself accountable. Instead, she blames everyone

else for her problems. She blames her parents for fostering in her the factors that led to her

troubles. *See, e.g.*, Annabi Mem. at 26. When the FBI asked her about the fake W-2's in her

mortgage loan files, she blamed unspecified political enemies for planting the documents. And when she was convicted at trial on all counts, she blamed her able, zealous trial counsel for faulty legal strategy at trial and decided to switch to new counsel, her fifth different attorney in this case to date. In sum, Annabi's family circumstances are hardly the basis for a downward departure or a downward variance.

### (2)    Annabi's Mental and Physical Health

According to Annabi, she has developed a number of mental and physical health problems since her arrest in this case, ranging from stress to headaches to gastritis. Annabi Mem. at 53-55. Annabi's stress is undoubtedly experienced by many defendants who come before this Court for sentencing. That discomfort, however, provides no basis for a downward variance.

The only real issue for the Court concerning the defendant's health issues is whether the Bureau of Prisons ("BOP") has the ability to adequately treat the defendant's condition. *United States* v. *Cutler*, 520 F.3d 136, 172-73 (2d Cir. 2008) (reversing the District Court's granting of a downward departure due to the defendant's health, finding that the District Court had erroneously assessed the medical evidence and that there was no support for the Court's view that the BOP could not care for the defendant); *United States* v. *Napoli*, 179 F.3d 1, 18 (2d Cir. 1999) (affirming failure to depart after court satisfied itself defendant was receiving adequate treatment from the BOP). In this case, there can be no dispute that the BOP is fully equipped to address Annabi's health issues and routinely treats inmates with similar ailments.

### (3)    Annabi's Parents' Poor Health

According to Annabi, her parents have serious health issues such as high blood pressure, acid reflux, and diabetes. Annabi Mem. at 59-60. She also recently provided the Court

with medical records describing a cancerous polyp removed from her father's intestine.  Annabi claims that her family relies on her to monitor her parents' health by, among other things, checking their blood pressure and blood sugar and ensuring that they take their medications.  *Id.* Assuming that Annabi's parents indeed suffer from serious health issues, the assistance provided to them by Annabi does not entitle her to a variance.  Put simply, there is no reason why Annabi's siblings or extended family cannot assist her parents, assuming that they need assistance.

### (4)   Public Service and "Good Deeds"

Like most defendants who come before this Court, Annabi is neither all bad nor all good.  The many letters submitted on her behalf attest to certain useful things she did as a City Councilwoman.  But Annabi's career in public service cuts two ways.  On the one hand, she served in public office for eight years.  On the other hand, as a lawmaker, she had a special obligation to adhere to the dictates of the law herself, and the record in this case reveals that time and time again she failed to fulfill that obligation.

The defendant's willingness to break the law repeatedly for her personal gain, and her lies and concealment would be unconscionable in any case.  Here, it is especially so because the defendant was a lawmaker trusted and elected by the public to act in its best interest when she committed the crimes in question.  That the defendant here would offer her public service and good deeds as mitigating factors is particularly curious.  It was, after all, her position as a public official that enabled her to commit the crimes for which she stands convicted.

Not surprisingly, the defendant has been able to muster a substantial number of letters from her friends and family and those whom she has helped in the past.  While the Court of course must consider these letters, the voices of those who have been betrayed by

Councilwoman Annabi's conduct – the citizens of the Second District and the whole City of Yonkers – also must be heard. Annabi's betrayal of the public trust is yet another huge blow to the public's confidence in democratic government. While that faith can be restored slowly, with hard work, and over a long period of time, that confidence and trust can never be fully replaced.

### b. Jereis

#### (1) Jereis Portrays Himself as a Family Man

In his sentencing submission, Jereis points to the letters submitted on his behalf as evidence of his commitment to his immediate and extended family. Jereis Mem. at 7. While the expressions of gratitude from Jereis's extended family are no doubt sincere, the portrayal of Jereis as a man committed to his family is hard to square with his entire trial defense – one in which he publicly proclaimed his unwavering love for another woman, Sandy Annabi. There is no doubt that this defense – designed to help Jereis himself – must have been exceedingly painful for his wife, who holds a public job in government, to hear. Nevertheless, his wife was still gracious enough to write a letter on his behalf. Jereis's relationship with his family provides no basis for a below-the-Guidelines sentence.

#### (2) Jereis's Mother's Poor Health

Almost in passing, Jereis also requests leniency because of his "family situation" relating to his mother. According to Jereis, his mother is "extremely old and overweight" and has difficulty getting down the stairs of her apartment to attend doctor's appointments. Jereis Mem. at 9. Jereis claims that he is the only one of his six siblings physically capable of assisting in carrying his mother down the stairs. While Mrs. Jereis's health condition is regrettable, Jereis's shameless claim that he is the only one who can help her down the stairs does not ring true and, even if it did, the solution to the problem is not to sentence him to a term of probation.

30

(3)    **Good Deeds**

The argument above about Annabi's supposed good deeds is equally applicable to Jereis. Not only was Jereis very active in politics, but for many years Jereis also held a state job working for New York State Senator Nicholas Spano, whose district included the City of Yonkers. Accordingly, it is not surprising that Jereis is able to muster letters of support from some people on whose behalf he worked – after all, that was his job. But these letters should not drown out the voices of the many more people, both in and out of Yonkers, who are once again dejected and disgusted to see another case involving official corruption.

**3.    Deterrence and the Need for the Sentence to Reflect the Seriousness of the Offense and to Promote Respect for the Law**

Perhaps the most important factor under Section 3553(a) in a corruption case is the need for the sentence to create general deterrence and "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). Their crimes were very serious. They shook down developers for cash payments in exchange for selling Councilwoman Annabi's vote. They cut secret backroom deals with a large developer on the largest project in the history of Yonkers. Their crimes were not a one-time occurrence, but were methodically carried out over a period of several years. Their crimes were calculated, concealed, built on a pyramid of lies, and driven by Annabi's and Jereis's decision to place their financial desires ahead of all else, including the public's interest and the law. In light of the severity and seriousness of their conduct, this factor cuts very strongly in favor of Guidelines range sentences for Annabi and Jereis.

Guidelines sentences are also required "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). Annabi's counsel urges the Court to sentence Annabi to a five-year term of probation to "send a message that years of the offender's life will

31

be spent reporting to a probation officer, and being subjected to his or her constant supervision." Annabi Mem. at 58. To quote tennis great John McEnroe (a native New Yorker), "You cannot be serious." Annabi must know that a sentence of probation – when she faces 14 to 17 years' imprisonment – would send a message that corruption crimes are anything but serious. Rather, sentences within the Guidelines range are needed for Annabi and Jereis to send a loud, clear message that violations of the public trust will not be met simply with tough talk, but with a significant term of imprisonment in order to deter others who might seek to engage in official corruption. *See* 18 U.S.C. § 3553(a)(2)(B).

Further, a Guidelines sentence is also needed to deter generally other potential tax cheats. "Taxes," wrote Oliver Wendell Holmes, "are what we pay for civilized society...." *Compania General de Tabacos* v. *Collector*, 275 U.S. 87, 100 (1927). Consequently, the federal government has a vital interest in ensuring that every taxpayer fulfill his or her obligations to report all income (including unlawful payments) and pay his or her fair share of federal income taxes. "The system of tax collection in the United States relies upon the honesty of taxpayers. The Government needs taxpayers to report timely, completely, and honestly all taxes they owe so that it can collect the taxes due." Modern Federal Jury Instructions, Sand, Instr. 59-2 (citing *Sansone* v. *United States*, 380 U.S. 343 (1965)). For all these reasons, sentences within the Guidelines range would deter others from committing corruption crimes, would promote respect for the law, would reflect the seriousness of the offenses, and would provide just punishment.

### 4. The Need to Avoid Unwarranted Sentencing Disparities

Finally, imposition of a sentence within the advisory Guidelines range best serves "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

a.    **Applicable Law**

In creating the Guidelines, "Congress sought uniformity in sentencing by narrowing the wide disparity in sentences imposed by different federal courts for similar criminal conduct." *Rita*, 551 U.S. at 349 (internal quotation omitted).  Even after Booker, "uniformity remains an important goal of sentencing." *Kimbrough*, 552 U.S. at 107.  The Guidelines "help to avoid excessive sentencing disparities," *id.* (internal quotation omitted), because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges," *Gall*, 552 U.S. at 54, and because most defendants are sentenced within the Guideline Ranges.  As the Supreme Court stated in *Gall*, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall*, 552 U.S. at 49.  A sister court in the Southern District of New York observed that a "sentencing judge's decision to place special weight on the recommended guidelines range will often be appropriate, because the Sentencing Guidelines reflect the considered judgment of the Sentencing Commission, are the only integration of multiple [3553(a)] factors, and, with important exceptions ... were based upon the actual sentences of many judges." *Arakelian* v. *United States*, Nos. 08 Cv. 3224 (RPP), 04 Cr. 447 (RPP), 2009 WL 211486 (S.D.N.Y. Jan. 28, 2009).  Thus, the Second Circuit has instructed district judges to consider the Guidelines "faithfully" in sentencing.  *United States* v. *Crosby*, 397 F.3d 103, 114 (2d Cir. 2005).  As the Supreme Court noted, "if judges are obligated to do no more than consult the Guidelines before deciding upon the sentence that is, in their independent judgment, sufficient to serve the other § 3553(a) factors, federal sentencing will not move ... in Congress' preferred direction...  On the contrary, sentencing disparities will gradually increase." *Gall*, 552 U.S. at 63-64.

33

### b.     Jereis's Discussion of Other Sentences in Corruption Cases Is Not Applicable

Both defendants ask the Court to impose non-custodial sentences.  Jereis cites eight cases in which sentences were imposed in what he calls other cases of "so-called political corruption" that are far lower than the Guidelines ranges here.  *See* Jereis Mem. at 2, 4-6.

But Jereis's faulty survey is meaningless without a careful comparison of the offense conduct, the actual Guidelines ranges applicable in those cases (which are notably not included), and all facts relevant to the Section 3553(a) factors contained in the PSR and presented to the various sentencing courts to the facts of this case.  Because Jereis makes no such comparison, his argument should be ignored.  In similar circumstances, courts have observed that comparing a defendant's sentence to those imposed in other specific cases is weak evidence. *See, e.g.*, *United States* v. *Saez*, 444 F.3d 15, 19 (1st Cir. 2006).  Such tenuous comparisons "open the door to endless rummaging by lawyers through sentences in other cases, each side finding random examples to support a higher or lower sentence, as their clients' interest dictate." *Saez*, 444 F.3d at 19.

Even a cursory look at the examples of relatively lower sentences cited by Jereis demonstrates the faulty logic of his argument.  Most glaringly, Jereis cites to the sentence of 12 months' imprisonment imposed on former Senator Nicholas Spano as evidence that he (Jereis) should receive a far lighter sentence.  Jereis Mem. at 6.  Jereis appears to argue that since Senator Spano served as Jereis's boss, his criminal conduct must have been more serious than Jereis's. But we are not talking about an organized crime enterprise where hierarchy often conveys a person's knowledge of the criminal enterprise.  Here, counsel overlooks that Senator Spano was convicted of one tax crime, i.e., obstructing the IRS in violation of Title 26, United States Code, Section 7212(a).  In addition, unlike Jereis who exercised his right to go to trial, Spano pled

guilty to an Information and thus received a three-point reduction for acceptance of responsibility. Spano signed a plea agreement in which the parties stipulated that the Guidelines range was 12 to 18 months' imprisonment. Judge Seibel adopted the PSR's Guidelines calculation and sentenced Spano to 12 months' imprisonment, i.e., *a sentence within the applicable guidelines range*. Thus, because Senator Spano was sentenced within the applicable Guidelines range, Jereis's reliance on the sentence imposed in that case is entirely misplaced.

Other comparable cases not referred to in Jereis's flawed survey demonstrate how seriously courts consider bribery offenses. Sadly, judges are required all too routinely to impose significant terms of imprisonment because of the need to provide just punishment, promote respect for the law, and to help effect the goal of general deterrence in corruption cases.

For example, in the *United States* v. *McLaughlin*, 06 Cr. 965 (RJS) (S.D.N.Y.), Judge Sullivan sentenced former Assemblyman McLaughlin to 120 months' imprisonment for crimes including fraud and racketeering – notwithstanding the Government's motion for a downward departure pursuant to 5K1.1 of the United States Sentencing Guidelines in light of McLaughlin's cooperation. In sentencing McLaughlin, Judge Sullivan explained, "I think general deterrence is crucial here with a public official, someone who held high office, who was respected and admired, who had access to the types of people who had written letters, generously, but nevertheless powerful people who can write articulate and thoughtful letters. You had every opportunity, and you used those opportunities and squandered them for your own benefit on a monumental scale." Tr. dated May 20, 2009 at 43.

In *United States* v. *Anthony Seminerio*, 08 Cr. 1238 (NRB) (S.D.N.Y.), Judge Buchwald sentenced former Assemblyman Seminerio to a below-Guidelines sentence of 72 months' imprisonment for his bribery conduct – notwithstanding the fact that Seminerio was 74

years old and suffered from a number of severe medical conditions.  In sentencing Seminerio,

Judge Buchwald explained, "Citizens are entitled to trust in the integrity of their government.

Now is the time to impose a sentence which sends a message that such conduct is unacceptable

because it destroys the fabric of our society.  This is [a] message to people like you who have a

choice, who have options.  This sentence must be a message to other public officials who see

easy money and a setting in which the ethics rules do little to prevent temptation."  Tr. dated

February 4, 2010 at 19.

In *United States* v. *Efrain Gonzalez*, 06 Cr. 726 (WHP) (S.D.N.Y.), Judge Pauley

sentenced former Senator Gonzalez – who faced 108-135 months' imprisonment – to 84 months'

imprisonment for crimes involving the embezzlement of New York State monies.  In sentencing

Gonzalez, Judge Pauley explained, "While he undoubtedly performed some good and generous

acts throughout his life and as a senator, as many of the letters that were submitted to the Court

attest, he has brought public disgrace onto himself and the New York State Senate.... there is a

compelling need to punish him for his venal acts and to ensure general deterrence among those

who would try to use their public offices for personal gain."  Tr. dated May 25, 2010 at 40-41.

Similarly, in *United States* v. *Miguel Martinez*, 09 Cr. 695 (PAC) (SDNY), Judge

Crotty sentenced former New York City Councilman Martinez -- who faced a Guidelines range

of 57 to 71 months' imprisonment – to 60 months' imprisonment for embezzling and laundering

approximately $100,000.  In sentencing Martinez, Judge Crotty explained, "in light of what Mr.

Martinez has done over a substantial period of time, where he betrayed his office and violated

the oath of office and did so on a frequent and repeated basis over an extended period of time,

the only way to promote respect for the law is to give him a sentence that is within the

Guidelines range."  Tr. dated December 15, 2009 at 34.

In *United States* v. *White*, 663 F.3d 1207(11th Cir. 2011), a supervisor of a county environmental services department was convicted for accepting approximately $22,000 in cash bribes in exchange for approving more than $1 million in professional services contracts. *Id.* at 1211. White argued for a below guidelines sentence arguing, among other things, that others in corruption cases received relatively low sentences. *Id.* at 1212. Relying on the seriousness of public corruption cases, the court sentenced White to 120 months' imprisonment, which was below the applicable guidelines range of 188 to 235 months' imprisonment, and the Eleventh Circuit affirmed.

Lastly, in *United States* v. *Ganim*, 256 F. App'x 399, 402-03 (2d Cir. 2007), the Second Circuit affirmed a top-of-the-Guidelines-range sentence of 108 months' imprisonment when the former Mayor of Bridgeport, Connecticut faced a Guidelines range of 87 to 108 months' imprisonment.

### c.   **Annabi's Statistical Arguments**

Next, Annabi argues that a non-custodial sentence would not result in a sentencing disparity based on statistics maintained by the Sentencing Commission. *See* Annabi Mem. at 55-57. Annabi's lengthy discussion about statistical averages is no more helpful to her quest for leniency in this case than is Jereis's highly selective survey of inapposite cases.

Although statistics may show a disparity between the average sentence imposed and the advisory guidelines range in a particular case, there is no evidence that the disparity is unwarranted. *See United States* v. *Irving*, 554 F.3d 64, 75 (2d Cir. 2009) (district court correctly disregarded statistics); *United States* v. *Willingham*, 497 F.3d 541, 545 (5th Cir. 2007) (reliance on nationwide statistical analysis clear error). "'[A]verages of sentences that provide no details underlying the sentences are unreliable to determine unwarranted disparity because they do not

reflect the enhancements or adjustments for the aggravating or mitigating factors that distinguish individual cases.'" *Irving*, 554 F.3d at 76.  As reflected in the PSR, there were a number of specific offense characteristics resulting in a higher offense level in this case.  The averages in the report cited by Annabi disregard individual circumstances and only reflect a broad grouping of sentences imposed on a broad grouping of criminal defendants.  Consequently, they are basically meaningless in considering whether a disparity with respect to a particular defendant is warranted or unwarranted.

Thus, the cases set forth above in Section 4.b demonstrate that many courts – both within the SDNY and in other districts – have sentenced defendants convicted of corruption crimes near, within, or at the top of the Guidelines range.  The Section 3553(a) factor setting forth "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" argues for Guidelines range sentences here.

## III.  RESTITUTION

Restitution should be ordered in this case to three separate victims.  Both defendants should be required to pay to the City of Yonkers an amount equal to the salary paid to Annabi for the period of her fraudulent conduct and disloyal service to the City of Yonkers and its citizens in the amount of $311,624.[5]  Further, the City of Yonkers should also be awarded $64,071 as reimbursement for reasonable and necessary fees incurred in connection with the investigation and prosecution of this case.  *See generally* Carbone Aff.  In addition, both defendants should be required to pay restitution to Antonio and Franco Milio in the amount of $20,000 in connection with Count 6, the crime of extortion under color of official right.  Finally,

---

[5]         Count 2 of the Indictment charges that Annabi and Jereis conspired to deprive the City of Yonkers of Annabi's honest services from between 2002 through 2009.  Annabi received the following salary in the following years from the City of Yonkers: 2002=$32,528; 2003=$32,400; 2004=$42,039; 2005=$42,072; 2006=$38,436; 2007=$38,666; 2008=$42,685; and 2009=$42,798, for a total of $311,624.

restitution in the amount of $164,460.68 should be ordered to PNC Bank against defendant

Sandy Annabi in connection with Count 8, the crime of making false statements to a bank in

connection with the loan made on 45 Bacon Place, Yonkers, New York.

### A.    The Applicable Restitution Statute

The Mandatory Victim's Restitution Act, 18 U.S.C. § 3663A (the "MVRA"), is

the most-applicable restitution statute for the defendant's crimes. *See also United States* v.

*Piggie*, 303 F.3d 923, 928 (8th Cir. 2002) (applying the MVRA in a case of honest services

fraud); *United States* v. *Paquette*, 201 F.3d 40, 44 (1st Cir. 2000) (same); *United States* v. *Gee*,

432 F.3d 713, 714 (7th Cir. 2005) (applying the MVRA for a violation of 18 U.S.C. § 666). The

MVRA makes the award of restitution mandatory.[6] The MVRA requires that the Court's "order

of restitution *shall require that such defendant* – in any case, *reimburse the victim for* lost

income and *necessary* child care, transportation, and *other expenses incurred during the*

*participation in the investigation or prosecution of the offense or attendance at proceedings*

*related to the offense.*" 18 U.S.C. § 3663A(b)(4) (emphasis added).[7]

The MVRA defines "victim" to mean one "directly and proximately harmed as a

result of the commission of an offense for which restitution may be ordered." 18 U.S.C. §

3663A(a)(2). The City of Yonkers, the Milios and PNC Bank all qualify as victims in this case

because they were "directly and proximately harmed" by the offense conduct.

In this case, all the costs that the City of Yonkers incurred in complying with the

various requests of the Government during the investigation and preparation for trial were

"necessary . . . expenses incurred during the participation in the investigation or prosecution of

the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4).   The

---

[6]    A second statute, the Victim and Witness Protection Act (the "VWPA"), makes restitution discretionary.
*See* 18 U.S.C. § 3663(b)(4).
[7]    The same language is found in the discretionary restitution statute, the VWPA. *See* 18 U.S.C. § 3663(b)(4).

Government requested to meet with a number of City of Yonkers employees as part of its investigation and preparation for trial. In some instances, the City of Yonkers incurred significant legal expenses as part of its representation of its employees in those meetings with the Government and at trial. For those reasons, the City of Yonkers legal expenses fall clearly under the statutory language. *See United States* v. *Bahel*, 662 F.3d 610, 647-48 (2d Cir. 2011) (legal fees expended by UN necessary to participate in Government's investigation properly subject to order of restitution).

### B.      The Amount of Restitution Owed to the City of Yonkers

The defendants were convicted of engaging in a bribe scheme spanning from 2002 through 2009, thus defrauding the City of Yonkers of its right to the honest services of its employee. As a principal, the City of Yonkers paid a salary to the defendant Annabi, an employee and a fiduciary, on the condition that she conducted her work with the primary view of serving the best interests of the City of Yonkers and its citizens. Instead, the defendant reneged on her end of this employment agreement by selling her services to a third party in a way that damaged the City of Yonkers significantly. A very large percentage of the harm the City of Yonkers suffered as a result of the defendants' fraudulent scheme is difficult to quantify in pecuniary terms. For example, there is no way to put a price tag on the reputational harm and the loss of confidence in its governing officials the City of Yonkers has suffered as a result of the defendants' corruption being exposed.

It is possible, however, to quantify how much money the City of Yonkers paid Annabi when Annabi was not fulfilling her end of her employment agreement. While she was accepting her salary from the City of Yonkers, the defendant represented to individuals throughout the City of Yonkers that she was acting in the City's best interests. The proof at trial

demonstrated that she actually was not acting in such a manner and the defendants' first loyalties actually were to herself and to her co-defendant Zehy Jereis. Annabi lied year after year on her financial disclosure forms about the secret financial benefits she was receiving from Jereis and Mangone. Accordingly, the defendants defrauded the City of Yonkers of the salary it was paying to her during the years of his disloyalty. As such, that salary should be returned to the City of Yonkers in the form of restitution. *See* 18 U.S.C. § 3663A(b)(1)(B)(i)(I) (requiring the restitution order to include the value of the property on the date of loss); *United States* v. *Bahel*, 662 F.3d 610, 649 (2d Cir. 2011) (salary of corrupt UN official convicted of honest services fraud in bribe case properly subject to order of restitution); *City of New York* v. *Bower*, 1991 WL 19810 (S.D.N.Y. Feb. 1. 1991) (LMM) ("Bower received salary payments from the City in exchange for work which he failed to perform. His conviction for violations of the Hobbs Act establishes that he was a faithless employee and that his employer, the City, is entitled to recover the salary paid to him.").

## IV.  COSTS OF PROSECUTION

As noted above, Annabi was convicted of two counts of willfully filing false tax returns in violation of Title 26, United States Code, Section 7206. This section specifies that a sentence for violating this statute shall include payment of "the costs of prosecution." It is well settled that the costs to which Section 7206 refers are those set forth in 28 U.S.C. § 1920. *See, e.g.*, *United States* v. *Vaughn*, 636 F.2d 921, 922 (4th Cir. 1980). These costs include fees of the clerk and marshal, fees of the court reporter, witness fees, travel fees and copying costs. The Government must file a bill of costs which, upon allowance, will be included in the judgment or decree. As a general rule, the phrase "together with the costs of prosecution" has been construed literally, and imposition of costs has been determined to be mandatory. *See United States* v.

41

*Palmer*, 809 F.2d 1504, 1506 (11th Cir. 1987); *United States* v. *Saussy*, 802 F.2d 849 (6th Cir. 1986); *United States* v. *Wyman*, 724 F.2d 684, 688 (8th Cir. 1984). The Government thus seeks imposition of the costs of prosecution in the amount of $113,578.49 (as delineated in the bill of costs set forth in the attached affirmation of Perry A. Carbone) as a part of Annabi's sentence.

## V. FINES

### A.   Annabi

Pursuant to the Sentencing Guidelines, the applicable fine for Guidelines level 33 is $17,500 to 175,000. As explained in the PSR at ¶155, however, Annabi does not have the resources to pay a fine, especially given her restitution obligations.

### B.   Jereis

Pursuant to the Sentencing Guidelines, the applicable fine for Guidelines level 30 is $15,000 to $150,000. As reflected in the PSR at ¶ 138, the defendant owns five rental properties in the City of Yonkers. Shortly before the indictment was returned in this case, Jereis transferred rental properties in the City of Yonkers into a limited liability company owned by his wife apparently to shield those assets from creditors, i.e., the Government. According to the PSR, the five properties owned by Jereis are currently valued at $3,445,000 and he has a total net worth of $1,708,609. PSR ¶137. In addition, Jereis is a 50 percent owner of a car wash, convenience store, and gas station located in Brooklyn, New York. Accordingly, Jereis has sufficient assets to pay a fine.

## VI. FORFEITURE

The Indictment S1 10 Cr. 007 (CM) included forfeiture allegations against both defendants. The Government will submit proposed Preliminary Orders of Forfeiture in advance of the sentencings.

## VII. BAIL PENDING APPEAL

Without explanation, defendant Jereis requests that the Court grant him bail pending the appeal that he intends to file. The defendant's request is frivolous.

The standards governing release pending appeal are set forth in Title 18, United States Code, Section 3143(b), which provides that a judicial officer "shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment" be detained pending appeal unless the judicial officer finds "by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community if released," *and* "that the appeal is not for the purpose of delay *and* raises a substantial question of law or fact likely to result in: (i) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process." 18 U.S.C. § 3143(b).

That provision gives effect to Congress's view that "once a person has been convicted and sentenced to jail, there is absolutely no reason for the law to favor release pending appeal or even to permit it in the absence of exceptional circumstances." *United States* v. *Miller*, 753 F.2d 19, 22 (3d Cir. 1985). Following a guilty verdict and sentencing, there is a "presumption in favor of detention." *United States* v. *Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004). It is the defendant's burden to "rebut that presumption with clear and convincing evidence." *Id.*

As defined by the Second Circuit, a "substantial question" is "one more of substance than would be necessary to a finding that it was frivolous. It is a 'close' question or one that very well could be decided the other way." *United States* v. *Randell*, 761 F.2d 122, 125 (2d Cir. 1985) (quoting *United States* v. *Giancola*, 754 F.2d 898, 900-01 (11th Cir. 1985)). "If a

court does find that a question raised on appeal is 'substantial,' it must then consider whether that question is 'so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial.'" *United States* v. *Randell*, 761 F.2d at 125 (quoting *United States* v. *Miller*, 753 F.2d at 23). With respect to these issues, "the burden of persuasion rests on the defendant." Defendant Jereis has failed to identify any "substantial question" he believes warrants bail pending appeal. In any event, because no substantial question exists, his request should be denied.

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court sentence the defendants to sentences within the applicable Sentencing Guidelines range, i.e., a sentence of 168 to 210 months' imprisonment for Defendant Sandy Annabi and a sentence of 135 to 168 months' imprisonment for Defendant Zehy Jereis. We ask that the Court impose these sentences to send the unmistakable message that those who are honored to serve in public office have a sacred duty to act with honesty and integrity, and for the good of the people, rather than for themselves.

Dated: White Plains, New York
        November 14, 2012

                            Respectfully submitted,

                            PREET BHARARA
                            United States Attorney

        By:     _____
                Jason P.W. Halperin / Perry A. Carbone
                Assistant United States Attorneys
                (914) 993-1933 / 1945
                (914) 993-1980 (fax)

                            44

## AFFIRMATION OF SERVICE

Jason P.W. Halperin, pursuant to Title 28, United States Code, Section 1746, hereby declares under the penalty of perjury:

That I am an Assistant United States Attorney in the Office of the United States Attorney for the Southern District of New York.

That on November 14, 2012, I caused one copy of the within Government's Sentencing Memorandum to be filed on ECF and thereby to be delivered by electronic mail to:

| | |
|---|---|
| Edward V. Sapone, Esq. | *Counsel for Defendant Annabi* |
| Anthony J. Siano, Esq. | *Counsel for Defendant Jereis* |

I declare under penalty of perjury that the foregoing is true and correct.  28 U.S.C. § 1746.

Jason P.W. Halperin
Assistant United States Attorney
(914) 993-1933

Dated:      White Plains, New York
            November 14, 2012

45